THE UNITED STATES DISTRICT COURT
IN THE WESTERN DISTRICT OF MICHIGAN

FILED — GR

02 APR 22 PM 5: 02

RONALD WESTOL SR., CLERK
U.S. DISTRICT COURT
WESTERN DISTRICT MICH.

Case No.

PATRICIA DENHOF
&
RENEE LECLEAR

**1:02 CV 0275**

Plaintiff(s)

v.

Hon. Wendell A. Miles
Senior, U.S. District Judge

(Chief) HARRY P. DOLAN, (Lt.) DANIEL MILLS, (Capt.) PAMELA CARRIER, (Lt.)
REBECCA WHITMAN, (Lt.)CAROL PRICE, (Sgt.) CHARLOTTE MASON,
Individually and in their Official Capacities.

Defendant(s)

**COMPLAINT**

_____/

EUGENIE B. EARDLEY (P48615)
JOHN F. EARDLEY (P P-35868)
EARDLEY LAW OFFICES, P.C.
Counsel for Plaintiffs
P.O. Box 830
Cannnonsburg, MI 48317
(616) 874-2647

## PARTIES

1) Plaintiff, Patricia Denhof, (hereinafter Plaintiff Denhof) is a resident of

Kent County, and was employed as a police officer for the City of Grand Rapids

Police Department, until her constructive discharge on or about April 18, 2002.

2) Plaintiff Renee LeClear, (hereinafter Plaintiff LeClear) is a resident of Kent

County and was employed as a police officer/detective for the City of Grand Rapids

1

Police Department until her constructive discharge on or about March 27, 2002.

3) Chief Harry P. Dolan is the Chief of Grand Rapids Police and a resident of Kent County Michigan.

4) Lieutenant Dan Mills is the Lieutenant of Internal Affairs with the Grand Rapids Police Department, and a resident of Kent County Michigan.

5) Lieutenant Rebecca Whitman is the Lieutenant of the Central Area for the City of Grand Rapids Police Department, and believed to be a resident of Kent County.

6) Captain Pamela Carrier is the Captain for the North Area for the City of Grand Rapids Police Department, and believed to be a resident of Kent County.

7) Lieutenant Carol Price is the Lieutenant for the North Area for the City of Grand Rapids Police Department and is believed to be a resident of Kent County.

8) Sergeant Charlotte Mason is the Sergeant for the Internal Affairs Unit of the Grand Rapids Police Department and is believed to be a resident of Kent County.

## JURISDICTION

9) The jurisdiction for this case arises out of a violation of the United States Constitution, First Amendment, a federal question, under 42 USC 1983.

## FACTS

### A) Plaintiff Patricia Denhof

10) Plaintiff Denhof was hired by Defendant(s) as a Police Officer on January 16, 1984, after experience as a police officer in Craig, Colorado, and Ft.

2

Collins, Colorado, and as a cadet at the Kent County Sheriff's Department..

11) Plaintiff Denhof was hired by Defendant(s) at $9.27 per hour, or a $19,281 per annum salary with full complement of City benefits.

12) Plaintiff Denhof received regular pay increases per city ordinances in 1984, including an upwards adjustment for her completion of an associates of arts degree on July 29, 1984.

13) Plaintiff Denhof received regular increases in pay from 1984 through 1989, when she received a merit-based increase in pay and then again in 1990, when she received a pay increase due to her completion of a bachelor's degree.

14) Plaintiff Denhof has continued to receive her regular salary increases up through 2000, but has "topped" out in pay at her rank, and can not get any further increases without an increase in rank.

15)) Plaintiff Denhof received numerous commendation letters over the years, from citizens who praised her, to official internal praise for outstanding work.

16) Plaintiff Denhof experienced various incidents of sexually discriminatory and harassing behavior from command staff and coworkers during her tenure of employment with the Grand Rapids Police Department, and as a result, filed a state court action in Kent County Circuit Court, the State of Michigan, along with 9 other female police officers in January 2001.

17) During that litigation, a Motion for Injunctive Relief was brought, and court hearings were held in November 2001 about alleged retaliation and retribution visited upon Plaintiffs in the state court action.

18) After Plaintiff Denhof actively participated in a hearing before the state

3

Court in November of 2001 related to claims of retaliation during this litigation, she was subjected to direct retaliation for her testimony and claims made as a witness in the state court case.

19) Plaintiff Denhof spoke upon matters of public concern at several days of hearings, alleging illegal and corrupt activity on the part of the Grand Rapids Police Department, as well as being treated differently and negatively as a female police officer.

20) Plaintiff Denhof also testified about discrimination based on her sex and her status as a Plaintiff in a civil rights case and someone actively opposing sexual discrimination at the Grand Rapids Police Department.

21) On or about December 3, 2001, the State court issued its public  ruling on Plaintiffs' Motion for Injunctive Relief, denying their Motion and issuing a sanctions opinion, assessing attorneys fees and costs against Plaintiffs and their counsel for having filed their Motion.

22) In direct response to this court "victory" and in retaliation for the assertions made by Plaintiffs, several command staff at Grand Rapids Police Department, acting under the color of law in their capacity as City officials and as individuals,  beginning on approximately December 5, 2001, began to gather negative and in some cases, false information about Plaintiff Denhof and her work performance in order to further retaliate against her, to try to convince her and her co-Plaintiffs to dismiss their remaining claims altogether.

23) Memoranda were generated  by Defendants Price, Carrier and Whitman accusing Plaintiff Denhof of being "obsessed" with fellow officer Diane Watrous,

4

and of inappropriately hostile behavior that was possibly criminal behavior. **(See attached Exhibits A and B and C)**

24) In these memos, Defendants Price and Carrier referred specifically to Plaintiff Denhof's in-court testimony and lawsuit allegations as being the reasons for Defendant's actions in executing these memoranda.

25) Defendant Whitman wrote memos alleging hostile and inappropriate behavior on the part of Plaintiff Denhof, and ordered Sgt. James Potter to draft a memo about a conversation between he and Plaintiff Denhof that occurred in October 2001, which Plaintiff Denhof had referred to in her in court testimony in the injunction hearing in court in November 2001.

26) These memos asserted that Plaintiff Denhof was making false allegations and statements in her testimony and expressing threatening statements by stating that she would defend herself if her home were in fact broken into by anyone from Grand Rapids Police Department.

27) Another memo was generated by Lt. Mills and Sgt. Mason. **(See attached Exhibit D)**

28) This document inaccurately summarized Plaintiff Denhof's court testimony, and referred to her allegations and testimony about her belief in Defendant's intentional discrimination of her and other women, and as pled in that litigation, as evidence of paranoid and dangerous behavior, which might justify her being relieved of duty.

29) This document was generated in direct retaliation for Plaintiff Denhof's

5

testimony and litigation against the City of Grand Rapids Police Department, and gave the memos to Dr. Glen Peterson, the Defendant's "police psychologist" in order to allegedly demonstrate the need for immediately taking Plaintiff Denhof off of active duty and to strip her of her status as a police officer although not one inciting incident had occurred in the line of duty.

30) A Training Unit officer, Theodore Whalen, drafted a memo to Lt. Dan Lind in October, 2001, after Notice of the Motion for injunctive relief had been provided to Defendants.

31) This unsworn memo alleged hostile and insubordinate behavior on the part of Plaintiff Denhof during firearms training in October 2001, much of which was false and derogatory and, even if believed to be accurate, inconsequential, after Plaintiff Denhof had filled out an evaluation critique which was negative . **(See Attached Exhibit E)**

32) Lt. Lind and officers of the Training Unit, including Officer Whalen are the subjects of some of the most severe allegations of discrimination and harassment in the state court litigation, and of Plaintiff Denhof's criticisms and allegations of illegal and discriminatory behavior.

33) Defendant Dolan, based on Plaintiff Denhof's  court testimony and allegations, directed the Defendants' longtime police psychologist to indicate whether these allegations indicated a need for Plaintiff Denhof to have a "fitness for duty" evaluation. **(Attached Exhibit F)**

34)Despite these memos alleging Plaintiff Denhof's hostile and dangerous

6

behavior, no action was taken by the Defendant at the time.

35) As a result of the trial court's public statements made about the plaintiffs in its opinion on December 3 , 2001 and in fear of the award of further sanctions and retaliation, and in belief that the trial court's bias against the plaintiffs' cause made their case hopeless, some of the plaintiffs in the state court action sought to dismiss their claims at that time, and this was communicated to Defendants' attorneys.

36) Plaintiffs filed an appeal of the court's ruling on the award of sanctions dated December 18, 2001 on December 20, 2001.

37) Plaintiffs also filed a Application for Leave to Appeal the denial of injunctive relief on December 16, 2001.

38) Plaintiffs also filed a Motion for Stay of Enforcement of the Court's sanctions order to be heard Friday,  January 4, 2002.

39) At the January 4, 2002 hearing, the circuit Court stated that it would vacate its prior ruling as to the monetary award and not enforce the sanctions at that time.

40) The City attorney at the hearing asked the Court to "...send a message..." to the state court plaintiffs and enforce the sanctions bill immediately.

41) On January 10, 2002, the Court issued an opinion and order vacating the sanctions order.

42) On *January 11, 2002* Dr. Peterson, based only on uncorroborated communications generated from these Defendants about Plaintiff Denhof's state court lawsuit and related allegations and testimony recommended that she be taken

7

off duty. **(See attached Exhibit G)**

43) Plaintiff Denhof was stripped of her gun and badge on or about January 18, 2002 by the direct actions of Defendants Dolan, Mills, Mason, Whitman, Price and Carrier. **(See attached Exhibit H)**

44) This action was taken in late morning at the Defendant GRPD headquarters as Plaintiff Denhof was preparing to leave for vacation, after she was off duty at 11:00am.

45) Plaintiff Denhof had worked fours that morning on road patrol without any incident.

46) It had been over 8 weeks since the last hearing before the trial court in the state case concluded, and during that entire time, Plaintiff had worked her normal hours and patrol without incident.

47) Plaintiff Denhof remained off duty, with pay, but stripped of her authority to act as an officer from January 18, 2002 until April 18, 2002, at which time she was given a lengthy evaluation from Glenn Peterson, PhD., the City's psychologist, who found no specific diagnosis, and who only claimed that she "mismanages" her emotions and is not fit for duty. **(See Exhibit I)**

48) Defendant Dolan has, through Lt. Dan Mills advised Plaintiff Denhof that he is ending her administrative leave with pay, and that she must use up her remaining sick leave, and that she will "eventually" be considered to be terminated from employment, and that her condition is likely resistant to treatment.

49) Plaintiff Denhof was told that Defendant Dolan and Defendant Mills were

8

not interested in the second opinions from her treating doctors, but she insisted that a copy of their reports finding her fit for duty, by both a psychologist and a psychiatrist be placed in her personnel file per the Michigan state law, the Bullard-Plawecki Act. **(See Exhibit J)**

50) Despite alleged concern about her emotional status by Defendants, Plaintiff Denhof was permitted to continue to work active duty with the public from the time of the retaliation/motion for injunctive relief hearing until the late morning Friday, January 18, 2002.

51) Plaintiff Denhof was *ordered* to attend a psychological evaluation with Dr. Glen Peterson by letter from Lt. Dan Mills dated January 18, 2002.

52) During her administrative leave, Plaintiff Denhof was denied many overtime opportunities, holiday pay, the chance to apply for postings for new and open positions in the Department, including applying for the Sergeant's test, all in which she was interested, and denied attendance at mandatory training sessions.

53) Plaintiff Denhof's own position in Central has been filled with another officer on a permanent basis, Officer Robert Mercier.

54) These material adverse employment actions, including constructive discharge of Plaintiff Denhof were taken in direct retaliation, solely and/or substantially for Plaintiff Denhof's open assertions of wrongdoing and illegal activity on the part of Defendant department in her testimony and in the state court litigation, and would not have been taken but for her testimony and filing of the civil court action.

9

55) These actions on the part of the Defendants would chill a person of ordinary firmness from continuing to speak out and assert her rights in litigation and public fora.

56) In fact, following the state court's adverse ruling on plaintiffs' Motion for Injunctive Relief in December 2001, 5 (five) plaintiffs did determine that they could no longer continue as plaintiffs in this case for fear of continued retribution, retaliation and increased adverse action.

57) After Plaintiff Denhof and LeClear were taken off duty, one plaintiff who remains as an active duty officer was approached by command staff who questioned the abilities of her counsel and suggested that she may want to "jump ship..." instead of suffering the consequences of losing the case.

58) Defendant GRPD Memoranda about Plaintiff Denhof and testimony of Defendant Price in this state court action indicate that efforts are being made to include another state court Plaintiff, Debra Neerken, who testified in the state court case in some wrongdoing or negative behaviors by Defendants Price and Carrier but that they have so far been unsuccessful.

### B. Plaintiff Renee LeClear

59) Plaintiff Renee LeClear was hired by the City of Grand Rapids as a police officer on or about February 2, 1995.

60) Plaintiff LeClear became a permanent, full time police officer on or about June 1995.

61) Plaintiff LeClear experienced being treated differently than male officers for various things while employed with the Defendant, and joined 8 other female

10

officers in filing a case in Kent County Circuit Court, State of Michigan in January 2001.

62) During the state court litigation, Plaintiff LeClear signed releases for the named Defendants to obtain her medical records, and a report dated by her treating psychiatrist, Dr. Lawrence Probes was provided.

63) Plaintiff LeClear testified publicly  at the hearing requesting injunctive relief in November 2001 in Kent County Circuit Court as to matters of public concern, i.e., sexual discrimination at the Police Department, and retaliation for same.

64) Plaintiff Renee LeClear was also taken off duty the same day as Plaintiff Denhof, with similar allegations being made about her emotional status.

65) On March 27, 2002, Plaintiff LeClear was advised by Defendants of Dr. Peterson's findings about her emotional status, which was that she has a "personality disorder" based in large part on her expressed opinions and observations that sexual discrimination and harassment occur at the Defendant Department, requiring litigation. **(See Attached Exhibit K)**

66) Plaintiff LeClear was also told that the Chief had determined that she would no longer be paid while on leave, and that she would be required to use up sick and other leave after April 3, 2002, she was also told that she could not be continued on pay, she could not get a second opinion,  nor were any treatment options suggested by the report or Defendants to her.

67) Plaintiffs LeClear and Denhof are suffering from anxiety and stress over this situation, and her future career in law enforcement has been irreparably

11

harmed by this unnecessary and prolonged period of time off duty, and now the alleged findings on the part of Defendants' psychologist.

68) Plaintiff LeClear had voluntarily gone to see Dr. Mark Kane and Dr. Lawrence Probes for what were thought to be symptoms of Post-Traumatic Stress Disorder in 2000, and workplace harassment and the stress of litigation in 2001.

69) Shortly after the hearing in November 2001 related to this case, and after the trial court vacated its sanctions order, Defendant Dolan sent a letter to Dr. Glen Peterson, referring to the Probes report and this litigation. **(See Exhibits L & M)**

70) On January 18, 2002, Plaintiff LeClear was stripped of her gun and badge and escorted out of the headquarters, with a letter from Defendant Dan Mills informing her that she had to attend a psychological evaluation by Dr. Glen Peterson. **(See Exhibit N)**

71) There was no precipitating incident other than the information gained in the lawsuit's discovery and Plaintiff LeClear's court testimony in November 2001 that led to her being suspended evaluated and constructively discharged.

72) Plaintiff LeClear was not provided any other information about why she was being placed off duty.

73) Plaintiff LeClear was interviewed four times by Dr. Peterson, but the interviews halted in February 2002.

74) No word was obtained about her status, despite assurances she would be informed promptly.

75) During her leave, uniformed Grand Rapids officers came to her home

12

trying to serve subpoenas upon her, and she was given conflicting orders about how to handle subpoenas issued during her leave.

76) Her locker was padlocked, as was Plaintiff Denhof's.

77) In February, a street patrol officer, Dan Adams, was placed in her position in the Detective Unit, allegedly on a temporary basis.

78) Plaintiff LeClear was denied overtime assignment opportunities while on leave.

79) Plaintiff LeClear was denied opportunities for lateral transfers in specialized units and new positions while on leave.

80) Plaintiff LeClear missed mandatory training and sexual harassment training while on leave, as she was barred from the building.

81) It was not until March 27, 2002 that Plaintiff LeClear was informed of the findings of Peterson, with a report dated March 14, 2002.

82) This was done in a meeting with a representative of City Labor Relations, Lt. Dan Mills and Plaintiff, along with union officials.

83) Plaintiff LeClear was given a 13 page report stating that she had a personality disorder, which was likely untreatable, with *no attachments* **(Exhibit 0)** despite the report referring to 43 separate attachments.

84) She was told that the Chief had decided to end her leave status with pay, and told that she had to decide by April 3, 2002 how she wanted the rest of the leave handled.

85) When asked if she was being terminated, or if there were any treatment

13

recommendations being made, a Labor Relations representative, told Plaintiff LeClear that once her "time" ran out she would be separated from employment if she was unfit for duty.

86) Union officials requested a second opinion be done, and for a paid leave for Plaintiff LeClear until a second opinion was obtained and this was denied.

87) Plaintiff LeClear's treating psychologist and psychiatrist have determined she is fit for duty, and requested the information Peterson reviewed so that they may assess it to evaluate their own opinions, and this has been denied. **(See attached Exhibit P)**

88) The report from Peterson reviews her claims of sexual harassment and discrimination and concludes that *Plaintiff LeClear must be mentally unsound to believe that she has been discriminated against at the Department or retaliated against.*

89) The basis for Peterson's opinions is what he has been told by Defendants about Plaintiff LeClear's statements about illegal discrimination and retaliation in the workplace.

90) Nowhere in this report does Peterson reference any hard data or test scores, and an evaluation done by Peterson 7 years ago showed no such claimed personality disorder.

91) At the same time, he does not relate her alleged personality disorder to her hostile workplace environment or workplace treatment, but blames it on her *for her belief* and *statements* that actions that have occurred were based in

14

discriminatory treatment and behavior.

92) Some of the events referred to by Plaintiff LeClear cited by Peterson were testified to by LeClear and several other Plaintiffs in the injunction hearing.

93) Some of the statements by Plaintiff LeClear about a male officer groping female officers at the range, cited by Peterson as evidence of paranoia on the part of Plaintiff LeClear have been actually been corroborated by other plaintiffs in their deposition testimony, and in non-party witness testimony in the state court case.

94) Peterson's report essentially states that Plaintiff LeClear must be crazy/paranoid to believe that she and other women are the victims of sexual discrimination and harassment, and makes findings as to her credibility on the very issues of the state court litigation which encompass matters of public concern, ie, sexual discrimination and illegal activity in the police department.

95) Based on her outspoken opinions and action in filing this case and testifying in this case publicly, Defendants have constructively discharge Plaintiff LeClear by not permitting her to get a second opinion, not recommending treatment, and simply stating she cannot be a police officer any more, which are clearly  materially adverse employment actions.

96) Defendants further have caused Plaintiff LeClear harm by halting her pay, and insisting that she exhaust her remaining leave time without giving her any options to "remedy" her so called personality disorder, and ignoring the differing opinions from her own treating doctors.

97) Defendants' actions have been taken deliberately in order to have a "chilling" affect on Plaintiff LeClear and her co-plaintiffs in the state court suit and

induce her into "dropping" her lawsuit and "changing" her mind about her experience of sexual discrimination and harassment.

98) Due to Defendants' intentional actions, Plaintiff LeClear, a single mother and sole provider of two children, including a severely and permanently handicapped child who requires frequent hospitalization, expensive medication and a home health care aide, will shortly lose her health insurance and other City benefits.

99) Plaintiff LeClear has been told that Defendants do not consider her to be disabled due to work, nor are they saying she is permanently disabled.

100) Defendants's actions are intended not only to force Plaintiff LeClear to find other employment, but to choose making a worker's compensation claim and/or file for a City disability pension in order to maintain some income and benefits, and "admit" that she is disabled from police work, all in retribution for her speaking out about discrimination, harassment and retaliation at the Grand Rapids Police Department.

101) Fellow officers at the Department who are supportive of Plaintiff Le Clear have offered to donate sick leave and vacation time to Plaintiff LeClear, who has very little time available, so that she will not be starved into making any decisions, and this common practice, permitted under previous practice and policy has been specifically denied by Defendant for no reason other than spite and punishment for her status as a Plaintiff in this case and for having spoken out during hearings in the state court action.

102) Past practice and policy at the Department has been to permit male

16

officers with claimed emotional disabilities that impair fitness for duty to obtain treatment, and/or second opinions, and be continued with pay until their status can be determined.

103) Plaintiff LeClear has been treated differently and negatively due to her status as a female officer claiming sexual discrimination and harassment and retaliation.

104) Plaintiff LeClear is suffering from increased stress, anxiety and depression related to these recent adverse actions by Defendants.

105) Plaintiff LeClear's law enforcement career has been jeopardized by these actions may permanently prevent her continuing in law enforcement.

106) These actions by Defendants are extreme and outrageous, and have been based solely or primarily on Plaintiff LeClear's speaking out and protesting illegal actions on the part of Defendants.

## COUNT ONE: FIRST AMENDMENT VIOLATION UNDER SECTION 42 U.S.C. 1983 as to PLAINTIFF'S RIGHT TO FREE SPEECH

107) Plaintiffs hereby incorporate paragraphs 1-106 as if fully reincorporated herein.

108) Plaintiffs Denhof & LeClear are public employees, and subordinate of Defendants Dolan, Mills, Mason, Whitman, Carrier and Price at the time of all events as outlined above.

109) Plaintiffs spoke out on matters of public concern, specifically, as to the illegal and discriminatory and retaliatory actions and performance of individually named Defendants and the actions and policies of the Police Department and City.

17

110) Plaintiffs filed a lawsuit in January 2001 and testified in November 2001 as public expressions of their concerns and opinions about the discriminatory and illegal actions of Defendants, both individually as public officials and as agencies of the government.

111) In direct retribution and retaliation for Plaintiffs' opposition to Defendants' policies and actions, Defendants then deliberately worked to wrongfully force Plaintiffs out of their positions as police officers, by false accusations of emotional disability.

112) These unlawful actions were undertaken by all individual Defendants acting under the color of state law in their official capacities.

113) The actions of Defendants Dolan and Mills have culminated in the constructive discharge of Plaintiff LeClear from her job as police officer on or about March 27, 2002.

114) The actions of Defendants Dolan, Mills, Mason, Carrier, Whitman and Price have caused materially adverse employment action against Plaintiff Denhof as well as her constructive discharge.

115) Plaintiffs' testifying against and about Defendants in their actions as public officials in opposing their discriminatory illegal actions and management was the only or substantially motivating factor for Defendants' actions in taking Plaintiffs off work and denying them material employment opportunities and constructive discharge of Plaintiff LeClear, as outlined above.

116) The materially adverse, retaliatory employment actions taken by Defendants were injurious actions that would likely chill a person of ordinary

18

firmness from continuing to engage in that activity, and would not have been taken but for the testimony and litigation initiated by the Plaintiffs.

117) As such, Defendants actions violated Plaintiffs' well-established right to free expression under the First Amendment to the United State Constitution and their right to be free from retaliation in exercise thereof.

118) Wherefore, the above considered, Plaintiffs request Judgment against all Defendants, jointly and severally, for actual and exemplary damages, attorneys fees, and allowable under law.

## COUNT TWO: FIRST AMENDMENT VIOLATION UNDER SECTION 42 U.S.C. 1983 as TO PLAINTIFFS' RIGHT TO PETITION

119) Plaintiffs hereby incorporate paragraphs 1-118 as if fully reincorporated herein.

120) Plaintiffs Denhof & LeClear are public employees, and subordinate of Defendants Dolan, Mills, Mason, Whitman, Carrier and Price at the time of all events as outlined above.

121) Plaintiffs filed a state court lawsuit and motion addressing matters of public concern, specifically, as to the illegal and discriminatory and retaliatory actions and performance of all individually named Defendants and the actions and policies of the Police Department and City.

122) Plaintiffs filed a lawsuit in January 2001 and testified in November 2001 as public expressions of their concerns and opinions about the discriminatory and illegal actions of Defendants, both individually as public officials and as agencies of the government.

19

123) In direct retribution and retaliation for Plaintiffs' opposition to Defendants' policies and actions, Defendants then deliberately worked to wrongfully and successfully force Plaintiffs out of their positions as police officers, by false accusations of emotional disability.

124) These unlawful actions were undertaken by all individual Defendants acting under the color of state law in their official capacities.

125) The actions of Defendants Dolan and Mills have culminated in the constructive discharge of Plaintiff LeClear from her job as police officer on or about March 27, 2002.

126) The actions of Defendants Dolan, Mills, Mason, Carrier, Whitman and Price have caused materially adverse employment action against Plaintiff Denhof and her constructive discharge.

127) Plaintiffs' testifying against and about Defendants in their actions as public officials in opposing their discriminatory illegal actions and management was the only or substantially motivating factor for Defendants' actions in taking Plaintiffs off work and denying them material employment opportunities and constructive discharge of Plaintiff LeClear, as outlined above.

128) The materially adverse, retaliatory employment actions taken by Defendants were injurious actions that would likely chill a person of ordinary firmness from continuing to engage in that activity.

129) As such, Defendants actions violated Plaintiffs' well-established right to petition the government for redress, guaranteed under the First Amendment to the United State Constitution and their right to be free from retaliation in exercise

thereof.

130) Wherefore, the above considered, Plaintiffs request Judgment against all Defendants, jointly and severally, for actual and exemplary damages, attorneys fees and all damages allowable under law.

## COUNT THREE, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

131) Plaintiffs reincorporate paragraphs 1-130 as if set forth in full herein.

132) Defendants engaged in extreme and outrageous conduct in their unwarranted, actions towards Plaintiffs as outlined above, and in their constructive discharge from employment.

133) Defendants' actions were intentional and/or reckless, and showed complete disregard for Plaintiffs' emotional and mental well-beings.

134) Plaintiffs have suffered mental, physical and emotional distress as a result of Defendants' actions.

Wherefore, the above considered, Plaintiffs request Judgment against all Defendants, jointly and severally, for actual and exemplary damages allowable under law.

### DAMAGES

135) Defendants' actions and omissions, negligence and intentional conduct as outlined above, paragraphs 1 through 134 resulted in damages to Plaintiffs Denhof and LeClear as follows:

a) loss of their jobs, interruption and destruction of law enforcement careers,

b) mental and emotional suffering, past, present and future,

21

c) embarrassment and humiliation, past, present and future,

d) consequential damages, past, present and future,

e) attorneys fees and all allowable litigation costs,

f) and all damages provided for under federal law, as well as

g) constructive discharge of both.

## RELIEF REQUESTED

136)  WHEREFORE, the above considered, the above Plaintiffs request entry of a Judgment against all Defendant(s), and an award of all damages and equitable relief recoverable under 42 USC 1983, which flow from the illegal acts of Defendants, including award of reinstatement for Plaintiffs Denhof and LeClear, back pay, front pay, lost wages, consequential damages, attorneys fees, costs and interest, and such other temporary and permanent equitable and/or legal relief as the Court deems meet, including exemplary damages.

Respectfully Submitted,

April 22,  2002

EARDLEY LAW OFFICES, P.C.
Counsel for Plaintiffs

Eugene B. Eardley (P48615)
John F. Eardley (P-35868)
P.O. Box 830
Cannonsburg, MI 49317
(616) 874-2647

22