UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

PATRICIA DENHOF and
RENEE LeCLEAR,

        Plaintiffs,

v.                                                                               Case No. 1:02-CV-275

CITY OF GRAND RAPIDS,                                HON. GORDON J. QUIST

        Defendant.

_____/

**<u>OPINION</u>**

**<u>Introduction</u>**

The issue in this case is whether the City of Grand Rapids, Michigan, reasonably obtained and relied upon a fitness for duty examination by a respected psychologist, or, on the other hand, took the badges and firearms from the police officer Plaintiffs and placed the Plaintiffs on unpaid leave in retaliation for the Plaintiffs, along with seven other female officers, having sued the City and its police department for sexual discrimination. The jury found that Plaintiffs did prove that the City retaliated against them. This Court, however, in the exercise of its duties under Fed. R. Civ. P. 50(b), finds that Plaintiffs have failed to prove their cases under controlling law. The basic reason that this Court makes this ruling is that there is not sufficient evidence in the record from which a reasonable jury could conclude by a preponderance of the evidence that Chief Harry Dolan and other City officials had no reasonable basis for relying upon the report and conclusion of Dr. Glen Peterson, Ph. D., that the Plaintiffs were not fit for duty as police officers.

**Background**

This retaliation case was tried to a jury from November 29, 2004, to December 13, 2004.  At the close of the evidence, the Court instructed the jury to determine whether Defendant, the City of Grand Rapids ("City"), retaliated against Plaintiffs by: (1) taking their guns and badges; (2) putting them on unpaid, involuntary leave; and/or (3) not reinstating them.  The jury returned verdicts in favor of Plaintiffs, concluding that all three actions constituted retaliation and awarding each Plaintiff $223,080 in back pay, $1,276,920 in front pay, and $1,000,000 in compensatory damages.  On January 10, 2005, after conducting hearings on the issues of reduction of the back pay award for earnings offsets, reduction of the front pay award to reflect its present value, and reinstatement, the Court entered Judgments in favor of Plaintiffs and against the City.  Presently before the Court are the City's motion for judgment as a matter of law pursuant to Rule 50(b) and the City's motion for new trial and/or remittitur.  Both motions were filed on January 25, 2005, and are therefore timely.

Plaintiffs, Patricia Denhof ("Denhof") and Renee LeClear ("LeClear"), filed this lawsuit on April 22, 2002, against the City and several other defendants alleging various federal and state law claims.  By the time of trial in December 2004, the only claims remaining were the retaliation claims under Title VII and the Michigan Elliott-Larsen Civil Rights Act ("Elliott-Larsen") against the City.

Denhof and LeClear were two female Grand Rapids Police Officers.  In January 2001, Denhof, LeClear, and seven other female Grand Rapids Police Officers filed an action against the City and its police department in Kent County Circuit Court, asserting various claims of sexual discrimination and harassment.  On September 21, 2001, the state court plaintiffs filed a motion for a preliminary injunction asserting that the police department was retaliating against them for having filed the state court suit.  The state court held a hearing on the motion over an eight-day period in November 2001, during which numerous witnesses, including Denhof and LeClear, testified

2

regarding the allegations supporting the request for injunctive relief.  On December 3, 2001, the state

court judge, Judge Dennis C. Kolenda, issued his oral opinion denying the plaintiffs' motion.  In his

opinion, Judge Kolenda was critical of the plaintiffs' allegations of retaliation, noting that they were

either unsubstantiated or simply not true.  Judge Kolenda was particularly critical of Denhof's

testimony as "highly suspicious" and "gross exaggeration."

The City's Police Chief, Harry Dolan ("Dolan"), was present at the injunction hearing and

heard Denhof's testimony.  Dolan testified that based upon what he observed and heard in court as

well as Judge Kolenda's findings, he became concerned about Denhof's fitness to serve as a police

officer.  At about the same time, Dolan received through discovery in the state court action a copy

of a report prepared by Dr. Lawrence M. Probes regarding LeClear.  In his report, Dr. Probes stated,

among other things, that LeClear admitted to "experiencing a great deal of distress in connection

with her employment at the Grand Rapids Police Department" and noted that LeClear "had

symptoms of depression, anxiety, sleep disturbance, panic attacks and other forms of stress."

(10/11/01 Probes Report at 1, Def.'s Trial Ex. P.)  Dr. Probes also noted that LeClear identified her

work as a police officer as a significant cause of her depression.  (Id. at 4.)  Dolan testified that Dr.

Probes' findings regarding LeClear's emotional issues and mental state caused him, Dolan, to

become concerned about LeClear's ability to perform her duties as a police officer.  On December

13, 2001, Dolan sent letters to psychologist Glen Peterson, Ph.D., explaining his concerns about

Denhof and LeClear and requesting his advice upon the appropriateness of a psychological

evaluation for each of them.  In his letter regarding Denhof, Dolan wrote:

> While listening to Officer Denhof's testimony and observing her demeanor during
> that testimony, I became increasingly concerned with whether she is experiencing
> some emotional difficulties that may impair her ability to perform her duties. Officer
> Denhof testified that someone had attempted to break and enter her home; that she
> was followed by a car as she drove to work on that same day; that she believed her

3

telephone was tapped; and that she believed that the GRPD was responsible for these acts. What concerned me most was her testimony that, as a result of the alleged break-in, she has her personal firearm loaded and ready. She testified that she had told her Sergeant to "spread the word" that she will shoot anyone who illegally tries to come into her home. On cross-examination, she confirmed that this statement was meant as a warning to the GRPD. . . .

Officer Denhof further testified that she believes that fellow officers are refusing or neglecting to provide her with necessary back-up in dangerous situations. She described two incidents that she claimed to be examples of this, but my check of departmental records shows that she never called for assistance of this nature. On the other hand, she also said that she rarely calls for assistance because she likes to handle things on her own. Although both subsequently testified, neither plaintiff who was working with Officer Denhof on these two occasions made any claim that fellow officers had failed to assist them or even mentioned these events.

As Chief of Police, I am concerned that Officer Denhof's current emotional state may cause her to endanger herself or others on the job. As I perceive it, her testimony exhibited a great deal of anxiety and paranoia that is focused on the GRPD in general, and certain members of the department in particular. . . .

(Def.'s Trial Ex. A.) In his letter regarding LeClear, Dolan wrote:

My review of this report has caused me to be concerned that Officer Le Clear's current mental and emotional state may impair her ability to do her job in a safe and efficient manner. In particular, I am concerned about her statement, on page one, that she has been experiencing a great deal of stress in connection with her employment with the GRPD and that "she has had symptoms of depression, anxiety, sleep disturbance, panic attacks and other forms of stress." According to the report, she describes herself

". . . at the present time as hypervigilant, on guard, avoiding people at work. There are certain persons she will not meet with. She also avoids war movies or depictions of violence, since they make her nauseated. She feels emotionally numb. She said that her boyfriend wonders why she is so apethetic [sic]. Very little brings her joy or pleasure, and she remains irritable."

On page three of the report, Officer Le Clear states that, due to the anxiety caused by situations where others might observe her speaking in public, praying, or performing, she experiences significant stress while enduring such experiences, or avoids them altogether. On a questionaire [sic], she "endorsed" the following:

"'Someone is spying on me. Someone is persecuting me. Someone or a group is plotting to harm me. Someone has placed hidden

4

> microphones or cameras to spy on me.  (This is true!)  My telephone
> is taped or bugged.  (Don't know.)'"

> On their face, these comments appear to be inconsistent with police work.  As Chief
> of Police, I am caused to question whether Officer Le Clear's current mental and
> emotional state may interfere with her work. . . .

(Def.'s Trial Ex. O.)

Dr. Peterson testified that based upon his review of the materials Dolan furnished to him, Dr. Peterson determined that there were adequate reasons to refer both Denhof and LeClear for fitness for duty evaluations.  Dolan accepted Dr. Peterson's recommendations, and on January 18, 2002, Dolan placed Denhof and LeClear on paid administrative leave pending the outcome of Dr. Peterson's fitness for duty evaluations.  Dr. Peterson met with Denhof and LeClear in separate sessions over the next couple of months.  On March 14, 2002, Dr. Peterson issued a report finding LeClear unfit for duty.  On April 2, 2002, Dr. Peterson issued a report finding Denhof unfit for duty.  Subsequently, the City placed Plaintiffs on unpaid leave pending a successful completion of treatment and certification by Dr. Peterson that they were fit for duty.  Dr. Peterson never made such a certification, and Plaintiffs were never returned to paid status or active duty.

## Discussion

### I.    Motion for Judgment as a Matter of Law

The issue raised by a Rule 50 motion is whether there is sufficient evidence to create a question of fact for the jury.  Warkentien v. Vondracek, 633 F.2d 1, 6 (6th Cir. 1980).  The standard for granting a motion for judgment as a matter of law is the same as the standard for granting a motion for judgment notwithstanding the verdict.  See Am. & Foreign Ins. Co. v. Bolt, 106 F.3d 155, 157 n.3 (6th Cir. 1997).  The Sixth Circuit has described the standard for evaluating such motions as follows:

> In determining whether the evidence is sufficient, the trial court may neither weigh the evidence, pass on the credibility of witnesses, nor substitute its judgment for that of the jury.  Rather the evidence must be viewed in the light most favorable to the party against whom the motion is made, drawing from that evidence all reasonable inferences in his favor.  If, after thus viewing the evidence, the trial court is of the opinion that it points so strongly in favor of the movant that reasonable minds could not come to a different conclusion, then the motion should be granted.

Ratliff v. Wellington Exempted Vill. Schs. Bd. of Educ., 820 F.2d 792, 795 (6th Cir. 1987) (citations omitted); see also Williams v. Nashville Network, 132 F.3d 1123, 1131 (6th Cir. 1997) (stating that a Rule 50(b) motion "should be granted . . . only if reasonable minds could not come to a conclusion other than one favoring the movant").

A plaintiff may establish a claim of retaliation under Title VII or Elliott-Larsen by presenting direct evidence of retaliatory motive.  See Weigel v. Baptist Hosp. of E. Tenn., 302 F.3d 367, 381-82 (6th Cir. 2002); Harrison v. Olde Fin. Corp., 225 Mich. App. 601, 608-10, 572 N.W.2d 679, 682-83 (1997).  "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 926 (6th Cir. 1999).  Such "evidence proves the existence of a fact without any inferences or presumptions."  Norbuta v. Loctite Corp., No. 98-3013, 1999 WL 357780, at *1 (6th Cir. May 20, 1999) (per curiam).

In the absence of, or in addition to, direct evidence, a plaintiff may establish a retaliation claim by presenting circumstantial evidence under a burden-shifting approach, such as the McDonnell-Douglas framework.  See Abbott v. Crown Motor Co., 348 F.3d 537, 542 (6th Cir. 2003); Shefferly v. Health Alliance Plan of Mich., No. 02-2488, 2004 WL 784117, at *8 (6th Cir. Apr. 5, 2004) (noting that Michigan courts have applied the McDonnell Douglas framework to retaliation claims under the Elliott-Larsen Act).  To establish a prima facie case of retaliation under this method, a plaintiff must show that: (1) she engaged in activity protected under Title VII; (2) the

employer was aware of the plaintiff's protected activity; (3) she suffered an adverse employment action; and (4) there is a causal connection between the protected activity and the adverse employment action.  Singfield v. Akron Metro. Hous. Auth., 389 F.3d 555, 562-63 (6th Cir. 2004). If the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action.  Id. (citing Nguyen v. City of Cleveland, 229 F.3d 559, 562 (6th Cir. 2000)).  If the defendant meets its burden, the plaintiff must then demonstrate by a preponderance of the evidence that the proffered reason was mere pretext by showing that the proffered reason: (1) has no basis in fact; (2) did not actually motivate the adverse action; or (3) was insufficient to motivate the adverse action.  Id. (citing Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994)).

### A.      Dolan's December 13, 2001 Letters to Dr. Peterson Are Not Direct Evidence of Unlawful Retaliation

Although the parties and the Court treated the case as a circumstantial case under the McDonnell Douglas framework during trial, and the parties largely continue to do so in their briefs regarding the Rule 50(b) motion, the Court finds it appropriate to address Denhof's argument that Dolan's December 13, 2001, letters to Dr. Peterson constitute direct evidence of retaliatory motive. Denhof cites Judge Miles' summary judgment opinion, which concluded that the letters are direct evidence that unlawful retaliation was a motivating factor in Dolan's decision to refer Denhof and LeClear for fitness for duty evaluations.  As this Court explained during oral argument on the instant motions, it respectfully disagrees with Judge Miles' conclusion.  This Court does not view the letters as direct evidence because they do not show or suggest that Dolan acted *because of* Plaintiffs' filing or participation in the state court litigation.  Rather, both letters demonstrate that Dolan's concerns were prompted by information disclosed during the litigation that had a direct bearing upon

7

legitimate police concerns, namely, Plaintiffs' psychological fitness to serve as police officers. This is an important distinction for purposes of this case. On the one hand, "an employer may not use what theoretically may be a legitimate cause for discipline as a pretext for what is in reality retaliation against an employee for engaging in activity protected under Title VII." Jackson v. RKO Bottlers of Toledo, Inc., 743 F.2d 370, 378 (6th Cir. 1984). On the other hand, while Title VII precludes retaliation, it does not operate as a grant of immunity from all negative consequences that may arise from the employee's protected activity. Cf. Maness v. Star-Kist Foods, Inc., 7 F.3d 704, 707-08 (8th Cir. 1993) (holding that the district court did not err in concluding after a bench trial that the employer did not retaliate against the plaintiff when it terminated the plaintiff for refusing to meet with the employer's attorneys to discuss the plaintiff's disclosure of privileged information to a plaintiff in a separate discrimination suit because the reason for the termination was sufficiently independent of the underlying suit). By way of an extreme example (unrelated to the facts of this case), no one could reasonably question an employer's right and obligation to take disciplinary action against an employee who, during the course of a Title VII proceeding, admits to stealing from the employer or other employees or to selling drugs at work. Or, to take the Court's own "extreme, ridiculous hypothetical" given in its ruling on the City's Rule 50(a) motion, which is closer to the facts in this case, Dolan would have ample reason to question Denhof's psychological fitness to serve as a police officer if she had testified in the state court that another police officer prevented her from performing her duties by unleashing a herd of pink and black zebras. The fact that the employer acts upon such information disclosed during a Title VII proceeding would not establish, without further inference or presumption, that the employer was motivated by unlawful retaliation. Of course, a plaintiff could still show through other evidence that the legitimate basis for the adverse

8

employment action was merely pretext for retaliation.  Here, Dolan's statements in his letters about

his legitimate concerns based upon Denhof's testimony and Dr. Probes' report are unrelated to the

fact of the lawsuit itself and, without more, cannot compel the conclusion that Dolan's decision to

send Plaintiffs for fitness for duty evaluations was motivated by unlawful retaliation.

###### B.    Plaintiffs Failed to Show Retaliation Through Circumstantial Evidence

When a retaliation case has been fully tried on the merits to a jury, the court's primary

concern is not the prima facie case, but instead whether there was sufficient evidence in the record

to allow a reasonable trier of fact to conclude that the defendant's proffered reason for the adverse

employment action was pretext and that unlawful retaliation was the defendant's true motivation.

Williams, 132 F.3d at 1131-32.  However, the plaintiff's failure to support her prima facie case still

may be relevant to the ultimate issue of discrimination.  Gray v. Toshiba Am. Consumer Prods., Inc.,

263 F.3d 595, 599 (6th Cir. 2001).  The Supreme Court provided some guidance on this issue in

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S. Ct. 2097 (2000), in the context

of an age discrimination claim:

> Whether judgment as a matter of law is appropriate in any particular case will
> depend on a number of factors.  Those include the strength of the plaintiff's prima
> facie case, the probative value of the proof that the employer's explanation is false,
> and any other evidence that supports the employer's case and that properly may be
> considered on a motion for judgment as a matter of law.  For purposes of this case,
> we need not – and could not – resolve all of the circumstances in which such factors
> would entitle an employer to judgment as a matter of law.  It suffices to say that,
> because a prima facie case and sufficient evidence to reject the employer's
> explanation may permit a finding of liability, the Court of Appeals erred in
> proceeding from the premise that a plaintiff must always introduce additional,
> independent evidence of discrimination.

Id. at 148-49, 120 S. Ct. at 2109.  Thus, at a minimum, in addition to establishing a prima facie case,

the plaintiff must present sufficient evidence to permit the trier of fact to conclude that the

employer's proffered legitimate explanation was not the real reason for its actions.  See Gray, 263 F.3d at 599-600.

The City contends that Plaintiffs failed to present sufficient evidence to establish a prima facie case because Plaintiffs failed to present any evidence (as opposed to unsupported argument) other than temporal proximity to support a causal connection between the protected activity and the adverse employment action.  The City correctly notes that the Sixth Circuit has often stated that temporal proximity alone is insufficient to establish a causal connection.

In order to meet the causal connection requirement of the prima facie case, a plaintiff must produce sufficient evidence from which an inference can be reasonably drawn that the employer, in part at least, took the adverse action because the plaintiff engaged in a protected activity.  See Allen v. Mich. Dep't of Corr., 165 F.3d 405, 413 (6th Cir. 1999).   The Sixth Circuit has repeatedly held that temporal proximity, without other evidence of retaliatory conduct, is insufficient to establish the required causal connection for a retaliation claim.  See, e.g., Little v. BP Exploration & Oil Co., 265 F.3d 325, 363-64 (6th Cir. 2001); Nguyen v. City of Cleveland, 229 F.3d 559, 566; McElroy v. Philips Med. Sys. N. Am., Inc., Nos. 03-6219, 03-6351, 2005 WL 406335, at *10 (6th Cir. Feb. 18, 2005) (per curiam); Steiner v. Henderson, No. 03-4195, 2005 WL 221530, at *3  (6th Cir. Jan. 31, 2005).  A few cases have recognized that there may be circumstances in which temporal proximity might be sufficient by itself to establish a causal connection.  For example, in Nguyen, the court stated that "there may be circumstances where evidence of temporal proximity alone would be sufficient to support [an] inference" of such a connection.  Nguyen, 229 F.3d at 567; cf. Steiner, 2005 WL 221530, at *3 ("Numerous Sixth Circuit cases have noted that temporal proximity alone is often insufficient to prove the causal prong of the *prima facie* case.").  The Nguyen court did not

attempt to define the circumstances in which temporal proximity may be sufficient to infer a causal connection. However, in Dicarlo v. Potter, 358 F.3d 408 (6th Cir. 2004), the court held that a twenty-one day period between the date the plaintiff filed his EEO complaint and the date of his termination was "significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive." Id. at 422. Similarly, in Singfield v. Akron Metropolitan Housing Authority, 389 F.3d 555 (6th Cir. 2004), which this Court followed in denying the City's Rule 50(a) motion, the court held that the temporal proximity of three months between the plaintiff's discrimination charge and his termination was "significant enough to constitute sufficient evidence of a causal connection," therefore enabling the plaintiff to establish his prima facie case. See id. at 563.

In this particular case, although there is some temporal proximity, there are also independent facts and circumstances which occurred during and shortly after the state court injunction hearing that explain why Dolan acted when he did.[1]  In particular, the City presented evidence showing that Dolan referred Plaintiffs for fitness for duty evaluations based upon the nature of Denhof's testimony and Dr. Probes' report regarding LeClear. Plaintiffs failed to show that the City's articulated reasons had no basis in fact or that Dolan's decisions to refer them for fitness for duty evaluations was unreasonable or improper.

---

[1] The period between the protected activity, Plaintiffs' testimony in the state court litigation, and the first adverse action, taking Plaintiffs' guns and badges, was approximately six to eight weeks (recall that the Court held at trial that referring Plaintiffs for fitness for duty evaluations did not constitute an adverse employment action). See White v. Burlington N. & Santa Fe Ry. Co., 364 F.3d 789, 796-800 (6th Cir. 2004) (en banc); Sullivan v. River Valley Sch. Dist., 197 F.3d 804, 811-12 (6th Cir. 1999). Even if the temporal proximity between these two events could be considered significant enough to constitute indirect evidence of a causal connection, the fact that none of the other plaintiffs in the state court litigation suffered an adverse action undermines any inference of causation that might be drawn from temporal proximity. See Thompson v. Ameritech Adver. Servs., No. 00-2486, 2002 WL 1402140, at *3 (6th Cir. June 27, 2002).

Plaintiffs sought to cast aspersions on Dolan's rationale for referring them for fitness for duty examinations by arguing that: (1) there were no issues with Plaintiffs' job performances prior to their testimony in the state court case; (2) contrary to past practice, there were no specific job-related instances that precipitated the fitness for duty evaluations; (3) the Department sent biased, one-sided information to Dr. Peterson, thus "poisoning the well" for the fitness for duty evaluations; and (4) there were no criteria or established procedures for sending officers to fitness for duty evaluations. This evidence fails to raise an inference of retaliation. Contrary to Plaintiffs' argument, there were "precipitating events" giving rise to Dolan's decision, namely Denhof's testimony in the state court injunction proceeding and Dr. Probes' report regarding LeClear, and this information raised job performance issues about whether Plaintiffs were psychologically fit to work as police officers. Plaintiffs' assertion that the Department "set up" the outcome of the fitness for duty evaluations by providing biased or one-sided information to Dr. Peterson fails. The evidence showed that the City provided Plaintiffs' personnel files to Dr. Peterson, which included both unfavorable and favorable information, such as commendations. (Denhof Trial Ex. 1; LeClear Trial Ex. 10.) Likewise, the absence of criteria for sending someone for a fitness for duty exam suggests nothing about retaliation and makes good business sense in that a police department cannot reasonably quantify or collate all the criteria and instances wherein an exam should be required. Also, the problem with set criteria is that they are often used to condone wrongful and inappropriate conduct that does not match the specific written criteria.[2] Furthermore, one could hardly argue that the City did not have written criteria for all this time in order to retaliate against Plaintiffs.

---

[2]Plaintiffs' arguments were also internally inconsistent. On the one hand, Plaintiffs argued that the absence of established procedures or criteria for sending an officer for a fitness for duty exam supports their claim of retaliation, but on the other hand they argue that there was no "precipitating event" that usually triggers a fitness for duty examination.

Plaintiffs also argued that evidence that Dolan failed to take prompt action to remove Plaintiffs from active duty, even though Dolan's stated concern was that Plaintiffs could be a danger to themselves and others, demonstrated that Dolan's stated concerns were pretext.  However, as the Court indicated at oral argument, this argument ignored Dolan's explanation that he waited to hear back from Dr. Peterson before taking Plaintiffs' guns and badges.  If Dolan had not waited, in all likelihood Plaintiffs would argue that Dolan's precipitous action was evidence of retaliation – i.e., "He acted before he even knew the facts."  Moreover, Dolan testified that in spite of his concerns, he was willing to leave Plaintiffs on duty pending a response from Dr. Peterson because Denhof was being closely monitored by her command staff and LeClear was already in treatment.[3]

More importantly, and aside from failing to show that Dolan's concerns about Plaintiffs' psychological fitness was pretext, Plaintiffs failed to show that it was unreasonable for Dolan, who is not a psychologist and has no training in psychology, to rely upon a report by Dr. Peterson, a psychologist who specializes in performing fitness for duty evaluations for police departments, including the Michigan State Police, and who has regularly performed such evaluations for the City. Given Dolan's reliance on a professional's opinion in this case, especially a professional who has performed similar evaluations for the City for years and whose work has never given the City any reason to question or doubt his competence or professionalism, the "honest belief" rule set forth in Smith v. Chrysler Corp., 155 F.3d 799 (6th Cir. 1998), is particularly appropriate. Smith teaches that so long as an employer honestly believed in its proffered nondiscriminatory reason for taking an adverse action, the employee cannot establish pretext merely because the employer was mistaken or

---

[3]Plaintiffs also sought to show that Dolan's concerns were unfounded by disputing the findings in their files relating to discipline that they received in connection with certain events.  Whether such findings were correct and whether the discipline was warranted were issues having no bearing upon the claim of retaliation in this case because the events and discipline preceded the date of the injunction hearing in November of 2001 and were at issue in the state court case.

incorrect.  See id. at 806.  An employer has an honest belief in its reason for taking adverse action where the employer reasonably relies upon "the particularized facts that were before it at the time the decision was made."  Id. at 807.  Plaintiffs sought to impugn Dr. Peterson's report  and undermine Dolan's reliance upon it on several grounds, none of which was sufficient to call into question the reasonableness of Dolan's reliance.  First, Plaintiffs suggested that Dr. Peterson's conclusions were tainted from the outset because the City sent him biased and unfavorable information.  As noted above, this argument was unsupported by the evidence presented at trial.  Second, Plaintiffs argued that, because of his business relationship with the City, Dr. Peterson had an improper conflict of interest.  Frankly, the Court is at loss to understand why Dr. Peterson had a conflict of interest or how such a conflict would be relevant.  This argument is circular – i.e., Dr. Peterson found Plaintiffs unfit; therefore, Dr. Peterson had a conflict of interest and a corrupt opinion.  Dr. Peterson was not treating either Plaintiff at the time he conducted his examination on behalf of the City, so there was no conflict.  Furthermore, the fact that Dr. Peterson relies upon the City for a substantial portion of his work is a non-factor.  It was just as likely that financial considerations would weigh in favor of Dr. Peterson finding Plaintiffs fit for duty – thereby ensuring that Plaintiffs remained available for active duty and allowing the City to continue to reap the benefits of the years of police training it has provided to Plaintiffs – instead of finding them unfit for duty and rendering two officers unavailable for police work.  In short, Dr. Peterson is no different than any company physician who regularly examines employees to ensure that they are physically fit to meet the demands of the job.  Finally, Plaintiffs sought to attack the validity of Dr. Peterson's conclusions and reports by attempting to show that he was biased against Plaintiffs and by introducing the testimony of other psychologists and one psychiatrist who disputed at least some of Dr. Peterson's conclusions.  This method of attack was unavailing because, as the Court informed

14

counsel at the time of trial, this case is not about psychologist malpractice or whether Dr. Peterson's conclusions and reports were sound or correct. In fact, as this Court learned at trial, twelve different psychologists can give twelve different opinions about whether a police officer is fit for duty. This is not a hard science that may be validated through objective testing such as chemical, physical, or mathematical analysis. The relevant question was whether Dolan knew or should have known that he could not reasonably rely upon Dr. Peterson's report, and the evidence on this issue compelled a finding in the negative.[4]

Plaintiffs also argued that placing them on unpaid leave, rather placing them on light duty, after Dr. Peterson determined them to be unfit was an act of retaliation. Dolan testified that he made the decision to place Plaintiffs on an unpaid leave of absence pursuant to the City's standard practice when an officer is determined to be unfit. As noted above, Plaintiffs failed to present any evidence showing that Dolan's or the City's reliance upon Dr. Peterson's conclusions and reports was pretext. Moreover, Plaintiffs failed to present any evidence showing that the City had placed a similarly situated officer on light duty or paid leave.[5] Thus, Plaintiffs failed to create an inference of retaliation based upon being treated differently than other similarly situated officers.

Finally, Plaintiffs also argued that the City retaliated by failing to return them to work. Even though Plaintiffs were being treated by Dr. Kane and Dr. Probes, who said that Plaintiffs were fit for duty and did not need treatment, the City was entitled to continue to rely upon Dr. Peterson's opinion

---

[4]As the Court posited at oral argument, Plaintiffs' best argument on these facts would be that Dolan and Dr. Peterson had an understanding about the result Dolan wanted Dr. Peterson to reach, i.e., the result – unfit for duty – was predetermined. However, apart from pure speculation, there is no evidence to support such a claim.

[5]Edward Hillyer, a union representative, testified that police officers were assigned "light duty" on occasion when there was a question about fitness for duty. However, Plaintiffs failed to offer, either through Hillyer's testimony or that of another witness, evidence that *an officer similarly situated to Plaintiffs* was given light duty. Moreover, Hillyer admitted that his experience with fitness for duty evaluations and procedures was limited to the situations he dealt with through the grievance process.

that Plaintiffs would not be fit for duty until they received treatment for specific issues.  Plaintiffs were not receiving treatment approved by Dr. Peterson, and Dr. Peterson had not concluded that Plaintiffs were fit for duty.  Thus, Plaintiffs failed to demonstrate that the City's failure to return them to work was an act of retaliation.

## II.   Motion for New Trial and/or Remittitur

The City has also moved for a new trial pursuant to Fed. R. Civ. P. 59(a) or, in the alternative, remittitur.  Pursuant to Rule 50(c)(1), because the Court has concluded that the City is entitled to judgment as a matter of law, it must also rule on the City's motion for new trial in the event that the judgment is later vacated or reversed.  Fed. R. Civ. P. 50(c)(1).  As set forth below, the Court concludes that in the event the judgment is vacated or reversed, the motion for new trial should be granted upon the ground that the verdict was against the weight of the evidence.  In addition, in the event that the court of appeals determines that the City is not entitled to either judgment as a matter of law or a new trial on the ground that the verdict was against the weight of the evidence, the Court concludes that the City's motion for remittitur should be granted with respect to the award of consequential damages, subject to Plaintiffs' election for remittitur of consequential damages in lieu of a new trial.

Rule 59(a) provides that in the case of a jury trial, a court may grant a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States."  Fed. R. Civ. P. 59(a)(1).  A new trial is warranted under Rule 59(a) when the jury has reached a "'seriously erroneous result'" as evidenced by (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party.  See Holmes v. City of Massillon, 78 F.3d 1041, 1045-46 (6th Cir. 1996).  The City argues that it is

16

entitled to a new trial because the verdict was against the weight of the evidence, because the Court erred in precluding the City from introducing evidence of Denhof's prior performance and interpersonal problems, and because the cumulative effect of other errors warrants a new trial.

In ruling upon a motion for new trial based upon the ground that the verdict is against the weight of the evidence, a trial court may compare and weigh the opposing evidence. See Toth v. Yoder Co., 749 F.2d 1190, 1197 (6th Cir. 1984). A district court must set aside the verdict if it determines that the verdict is against the clear weight of the evidence. See J.C. Wyckoff & Assocs., Inc. v. Standard Fire Ins. Co., 936 F.2d 1474, 1487 (6th Cir. 1991). However, a court may not set aside a jury verdict simply because the jury could have drawn different inferences or conclusions or because the court believes that another result is more justified. See TCP Indus., Inc. v. Uniroyal, Inc., 661 F.2d 542, 546 (6th Cir. 1981). A court may grant a new trial upon the ground that the verdict was against the weight of the evidence only if the verdict was unreasonable. See United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc., 400 F.3d 428, 450 (6th Cir. 2005).

The Court concludes that the verdict was against the weight of the evidence for the same reasons that it concludes that the City is entitled to judgment as a matter of law. As discussed above, the City presented evidence that Dolan had legitimate reasons for referring Plaintiffs for fitness for duty evaluations and Plaintiffs failed to show that those reasons were pretext. Moreover, Plaintiffs failed to show that Dolan's reliance upon Dr. Peterson's report was unreasonable, that Dolan directed Dr. Peterson to reach any specific conclusions, or that Dolan did not have an "honest belief" that Dr. Peterson's conclusions were valid. At best, Plaintiffs' evidence regarding pretext was slim. Accordingly, the City is entitled to a new trial on this ground, and the Court thus finds it unnecessary to address the City's alternative grounds for a new trial.

17

As a general rule, a jury verdict should not be remitted by the court "unless it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss." Farber v. Massillon Bd. of Educ., 917 F.2d 1391, 1395 (6th Cir. 1990) (quoting Green v. Francis, 705 F.2d 846, 850 (6th Cir. 1983)).  A court should not reduce an award unless it is: (1) beyond the range supportable by proof; or (2) so excessive as to shock the conscience; or (3) the result of mistake. Bickel v. Korean Air Lines Co., 96 F.3d 151, 156 (6th Cir. 1996).  "A trial court is within its discretion in remitting a verdict only when, after reviewing all evidence in the light most favorable to the awardee, it is convinced that the verdict is clearly excessive, resulted from passion, bias or prejudice; or is so excessive or inadequate as to shock the judicial conscience of the court." Gregory v. Shelby County, 220 F.3d 433, 443 (6th Cir. 2000).

Although the City requests remittitur of the front and back pay awards as well as compensatory damages, the Court concludes that remittitur would be proper only with regard to the award of compensatory damages.  The City argues that the compensatory damage awards should be remitted because they were excessive, not supported by the evidence, and not within the limits of reasonable compensation.  The City points out that the jury's deliberations were relatively brief and the compensatory damage award was the same for both plaintiffs, suggesting that the jury failed to give proper consideration to the evidence and was swayed by sympathy or that the award was punitive in nature.  In Kearns v. Keystone Shipping Co., 863 F.2d 177 (1st Cir. 1988), the jury deliberated for a total of one hour and eighteen minutes on the plaintiff's age discrimination claim. The jury returned a verdict for the plaintiff in the amount of $99,000 in back pay.  The district court granted the defendant's motion for new trial on the ground that the verdict was against the weight of the evidence.  The court of appeals affirmed the ruling, noting that while "[b]rief jury deliberation

is not, in itself, sufficient basis to support a new trial motion . . . [w]hen brief jury deliberation is coupled with a verdict that is contrary to the great weight of the evidence, however, it creates a situation where the district court has an affirmative duty to set aside the verdict." Id. at 182.  The City argues that the $1 million compensatory damage awards in this case present such a situation because following a two-week trial, the jury deliberated for only about two hours, which included selecting a foreperson and having lunch, and found the same damages for both Plaintiffs, in spite of their different situations.  The City also notes that while Plaintiffs presented evidence that they were frustrated with their employment situation, cried more often, had to obtain alternative employment, and LeClear had to downsize her wedding and honeymoon plans, there was no evidence of severe distress which led to illness, necessitated medical or psychological treatment, destroyed marriages or other close relationships, or inhibited daily activities.  In fact, both Plaintiffs were, at the time of trial, working part time as police officers in a small Michigan community.

The Court agrees with the City that the $1 million damage awards were excessive based upon the facts of this case.  While there was evidence that the City's actions caused Plaintiffs mental anguish and humiliation, there was no evidence that Plaintiffs suffered any serious or long-lasting symptoms to justify such an award.  In addition, Plaintiffs failed to distinguish between Plaintiffs' emotional distress and humiliation resulting from the state court judge's ruling and the outcome of that case and the alleged retaliation in this case.  Federal courts have not hesitated to reduce large awards in similar cases.  For example, in Evans v. Port Authority of New York and New Jersey, 273 F.3d 346 (3d Cir. 2001), the jury awarded the plaintiff $1.15 million in compensatory damages on her race discrimination claim, and the district court reduced the compensatory damage award for emotional distress to $375,000.  In affirming the reduction, the court of appeals noted that the

plaintiff failed to cite any other case where an award of over $1 million in a discrimination case was upheld.  The court concluded that the plaintiff's evidence regarding damages, which was similar to the evidence in this case, was insufficient to support the award.  Moreover, although the court of appeals did not further reduce the award, it hinted that it was "a substantial amount, well above most emotional distress awards." Id. at 355.  See also Steffes v. Pepsi-Cola Personnel, Inc., Nos. 99-2185, 99-2226, 00-1376, 2001 WL 1631407, at *3 (6th Cir. Dec. 18, 2001) (affirming the district court's remittitur of emotional distress damages from $400,000 to $100,000); Clopp v. Atlantic County, No. 00-1103(JEI), 2002 WL 31242218, at *3 (D.N.J. Oct. 7, 2002) (remitting $300,000 compensatory damages award in retaliation case to $75,000).  Similarly, Michigan courts have found remittitur appropriate in similar cases.  See Wilson v. Gen. Motors Corp., 183 Mich. App. 21, 40, 454 N.W.2d 405, 415 (1990) (holding that the trial court did not abuse its discretion in reducing the jury's award of $750,000 to $375,000 in an employment discrimination and wrongful discharge action where the plaintiff failed to present expert testimony regarding her mental distress and the award was not for physical pain or suffering); Stanisz v. Fed. Express Corp., No. 236371, 2003 WL 21660885, at *16 (Mich. Ct. App. July 15, 2003) (per curiam) (holding that the trial court properly reduced the jury's award for noneconomic damages from $1.5 million to $600,000 on sex discrimination and retaliation claims).

When compared to the awards in the cases cited above, the award in this case is not only excessive, but also appears to be punitive, and therefore must be reduced.  Because Plaintiffs did not present evidence of what the Court considers to be severe emotional distress, the Court concludes that $350,000 per Plaintiff is a reasonable and adequate award.  Accordingly, the Court will conditionally grant the City's motion for remittitur, but will offer Plaintiffs the choice of a new trial

or a remitted compensatory damage award for each Plaintiff in the amount of $350,000.  See Brewer v. Uniroyal, Inc., 498 F.2d 973, 977 (6th Cir. 1974) (stating that "we hold, that the District Court must offer the party awarded damages the choice of a new trial or the amount of the Court's remittitur"); 12 Moore's Federal Practice §59.13[2][g][iii][A] (Matthew Bender 3d ed. 2003) ("When the court finds that a verdict is excessive . . . , it may overturn the verdict and order a new trial outright, or may order a new trial conditioned on the verdict winner's refusal to accept a 'remittitur.'").

## Conclusion

For the foregoing reasons, the Court will grant the City's motion for judgment as a matter of law pursuant to Rule 50(b).  If the court of appeals vacates or reverses the judgment, this Court will grant the City's motion for a new trial upon the ground that the verdict was against the weight of the evidence.  Finally, if the court of appeals concludes that the City is not entitled to a new trial upon the grounds that the verdict is against the weight of the evidence, the Court will conditionally grant the City's motion for remittitur and offer Plaintiffs the choice of remittitur or a new trial.

An Order consistent with this Opinion will be entered.

Dated:  May 24, 2005                             /s/ Gordon J. Quist
                                        GORDON J. QUIST
                                        UNITED STATES DISTRICT JUDGE

21